We'll be glad to hear from you. Thank you very much. Yes, sir. Can I please report? I'm Robin Cotten from Salisbury, Maryland, on behalf of the talent Reya Liberto. Ms. Liberto is African-American. She worked for the Clarion, which is a resort hotel owned by Impelli's. During her six weeks on the job, she was not disciplined. There's no record of any performance problem. And importantly, she was kept on after Labor Day, but she did have a problem with one of the managers at the hotel, Trudy Club. This club referred to Hispanic employees as chihuahuas. She addressed Ms. Liberto as little girl. She admonished her to remember her place. And finally, on two consecutive days, she called her a porch monkey and threatened to get her fired. Ms. Liberto then complained to Human Resources. HR forwarded the complaint to Dr. Berger, one of the impellis and the owner of the hotel. Dr. Berger immediately directed that she be fired. His explanation was that the complaint had prompted him to review her personnel file, which he felt disclosed performance issues that he had not previously been aware of. And so he directed that she be terminated. What did you say? Importantly, they kept her through Labor Day? Yes. What did you say? Right. It's the end of the season, Your Honor. So the importance of that is what? Well, typically after Labor Day, they operate with a skeleton crew. So if she was a good enough employee to be kept on after Labor Day. Oh, okay. I'm sorry, Your Honor. I didn't explain that. Okay. So the personnel file was produced during discovery. It contains no reference to any performance issue at all. In any event, a suit was brought under Title VII and Section 1981 asserting two counts, one for racial harassment, the hostile work environment theory, and the other was for wrongful retaliation. The district court entered summary judgment on both counts in favor of both appellees. On the racial harassment count, the court reasoned that calling your African American employee a porch monkey and threatening to fire her two days in a row was neither severe racial abuse nor pervasive racial abuse and, therefore, under the totality of the circumstances. You know, we have a number of cases, Supreme Court cases, that talk about stray remarks. Yes, sir. Are there some terms in your estimation that use one time, eliminate the stray remark standard? Yes, sir. And this is one of them. So you think that there's certain terms if used in and of itself create a hostile environment? I do, sir. Okay. But, of course, respectfully, in this case, we had Ms. Club speaking arguably in the heat of the moment and calling her employee a racial atheist. Don't we have cases, though, where people use racial comments, pretty outrageous racial comments, and that doesn't pass muster as offensive as they are, doesn't pass muster under the law as in and of themselves creating a hostile work environment? There are those cases, Your Honor. But there are also cases from this court saying that an extreme racial slur, if used even once, might be sufficient under the circumstances to generate an actionable racial harassment claim. So in this case, you think it's the comment itself or the comment in the context of other things going on? Both, Your Honor. I think in and of itself calling an employee this racial slur is intolerable. But here we do have context. She physically apparently was up in her face, spraying spittle into her face. She threatened to get her fired. Her voice was raised. She used profanity. I didn't hear you. She spit in her face, you say? She was so close to her, she was spraying saliva in her face. So she got spittle in her face from. Yes, sir. That's accurate. And, you know, giving Ms. Club the benefit of the doubt, you know, she may have spoken out of anger. It may have been something she said in the heat of the moment. But I find it critical that she came back the next day when Ms. Club was in a meeting with somebody else, pulled her out of the meeting, and instead of saying, look, you know, I was a little out of line yesterday. I hope you'll accept my apology. From the evidence that the court considered. Yes, Your Honor. I know there's a dispute about whether it should have considered other evidence, answers and interrogatories. But from the evidence the court considered, these remarks were made over a period of what time? Two days. Two days. Yes, sir. What does that do to your argument on hostile, pervasive work environment? I actually think it helps for the following reason. I think a day is a key. Because you think another two days would have been more and another two days would have been more. I do. But I think the fact that there was a cooling off period, surely enough time for Ms. Club to calm down, to master her emotions, think about what is an appropriate way to admonish a subordinate. She went back, and I think Ms. Liberto probably thought, here comes the apology. But instead, she virtually replayed the preceding day's conversation verbatim. This time called her a damn porch monkey. And so if she's willing to say it in cold blood, in apparently a calculated, persistent, premeditated fashion, it suggests that this is a course of conduct. It's not an anomaly. It's not an aberration. It's not somebody making a stray remark when they fly off the handle. So for those reasons, I think under the totality of the circumstances test, and for another important reason, which I'll address in a moment, it, at a minimum, was reasonable for Ms. Liberto to think that racial harassment was underway, which, of course, is the standard in a retaliation case. She doesn't have to be confronted with fully formed, actionable, summary judgment proof racial harassment. She simply has to have an objectively reasonable belief that it's underway. And I think today, anybody who even hypothetically picked up the phone and called a lawyer before complaining would be told, well, this is not right. There are cases out there which say that likening a human being to a jungle animal is intolerable. It's degrading in the extreme. There are cases that say that, as I mentioned to Judge Shedd, that even a single incident of such extreme racial abuse may, under the circumstances, suffice. But there's an important additional reason, which I think distinguishes this case from the Jordan case relied upon by Judge Bredar, the district court judge. In Jordan- Let me ask this on the question of retaliation. Doesn't retaliation cause of action require that she had an objective, reasonably objective belief that she was being punished for protected action? It does. If I might, Your Honor, objectively reasonable that racial harassment is occurring, that's where the objectively reasonable standard is applied. How do you match that up? Could you have a situation in which a court looking at the situation goes, you lose on summary judgment because there's just no reasonable inference that that was discriminatory? Which is what happened here. Right. Right. And still went on the retaliation claim. Well, I think if it's- Doesn't it require a reasonable interpretation of the events as the condition preceding it to the retaliation claim? I think that's- Do you understand my question? I think so, sir. I think there are lots of cases where the plaintiff loses on the underlying discrimination claim. As summary judgment. Right. But the retaliation case goes to the jury because it's inherently- If it was a subjective standard, that makes it obvious you could separate the two. But how do you separate the two? I'm asking you. I'm asking the other side, too. How do you separate the two when they're both based apparently on a reasonable interpretation of the facts? Right. Well, I think it goes like this. First, she has to have a subjective perception, which she had. Secondly, it can't be crazy. It can't be unreasonable. It can't be- But you've used the word- It can't be unduly sensitive. You've used the word unreasonable. Right. But on summary judgment on whether or not the environment was that, what she perceived it subjectively to be- Right. Summary judgment said, looking at everything in the light most favorable to her, no reasonable person could take that to be- Right. A problem. That's what the court said, and I respectfully think that- I know you disagree with that, but I'm giving you the hypothetical. Right. How can the second cause of action based on reasonableness exist? Well, the court could say, looking at the Jordan case, looking at some of these others, I don't think it's severe or pervasive enough, but there are a lot of judges who would disagree with me. There are certainly a lot of lawyers who would disagree with me, and I don't think it's proper to throw out- And wouldn't that give you a reasonable inference on the facts for summary judgment? If the court goes, I don't think it, but reasonable people could draw that inference, wouldn't you defeat summary judgment? If you get it wrong on the underlying discrimination case, but your belief is one that a lot of reasonable people would hold, it's not technically correct, but it's, in the view of the learned judge, untenable. In the view of authors of law review articles, it's not quite going to meet that Fourth Circuit standard. But, you know, in the eyes of a reasonable layperson, or even a reasonable employment lawyer, it might be regarded as impermissible racial harassment, because the Seventh Circuit has gone that way, and the Fifth Circuit's gone that way. It might be. So, I think it is entirely logical to see cases where the discrimination count goes out, but the retaliation count goes forward. And I think it's important to recall, in this case, if I might, that, unlike Jordan, the plaintiff, the appellant, Ms. Liberto, was actually the target of the abuse. This wasn't so-called secondary harassment. You know, in the Jordan case, the plaintiff was in a group watching TV depicting serial killers who were described in racially offensive terms by a boss. Mr. Scott, I hate to interrupt you, but I need you to address a subject before you run out of time. Yes, sir. Your opponent says that your client did not even know Ms. Clubb was a supervisor. Yes, she was. So, would you address that offense, so to speak? Thank you, sir. In Ms. Clubb's affidavit, which is included in the record at page 308, she says, I was a food and beverage manager. I was there for 20 years. Everybody agrees she was the owner's sort of right-hand person. I know, but what she says is your client didn't know she was a supervisor when she was making these alleged statements. I don't… And that makes a big difference as to what standard we apply. Well, I don't… Well, I think it makes a big difference what her position was. I don't know that it makes a difference whether the appellant understood clearly what her role was. She certainly understood that she was highly influential with the owner, Dr. Berger, as evidenced by the fact that when she was meeting with her direct supervisor, Mr. Hubeck, Ms. Clubb says, I'm more important, and does this, motioning with her finger. Out goes Ms. Clubb. No objection from Mr. Hubeck. Ms. Liberto acknowledged that she had to take direction from this lady, and Ms. Clubb stated in her affidavit that she oversaw every aspect of the operation. So the fact that she didn't understand precisely Ms. Clubb's job description or where she fit in on the hierarchy or the flow chart should not affect the standard that this court applies to measure Ms. Liberto's subjective or objectively reasonable reaction to racial abuse that I think we can all agree no self-respecting person would tolerate. Well, does it matter whether or not the employee recognizes the offending person as a supervisor? Well, I think… I don't think her subjective understanding of that matters. I think what matters is whether or not the person engaging in the abuse is, in fact, a manager, a supervisor, an administrator. But I will point out that in this case, Ms. Liberto certainly acknowledged that Ms. Clubb was an influential and an important person. She'd been with Dr. Berger for 20 years. Everybody regarded her as his right-hand confidant. I thought she said she thought Ms. Clubb was some kind of hostess or something like that. She didn't know what exactly her position was. She did give her the hostess rubric, and Ms. Clubb said that that was, in fact, an important part of what she did. She was there to greet people with the clarion and make sure that customers were happy and kind of make people feel good. But it's absolutely undisputed that Ms. Clubb was a manager. She was highly influential. She kept her job with a wrap on the hand as a result of this incident. She was important enough in everybody's eyes that she could pull an employee out of a meeting with their boss without a murmur of objection from anybody. And, in fact, she made good on her threat to get Ms. Liberto fired. So I think it is disingenuous for my opposition to say, well, the victim didn't really understand the importance of her tormentor. The importance of her tormentor is borne out vividly by the demise of my client. So, respectfully, I think the district court got it wrong on both counts. I think this was actionable racial harassment. It doesn't merely support an objectively reasonable belief. It's something no self-respecting person would put up with today. If I might, I certainly wouldn't put up with it in the workplace, and I don't think it is appropriate for people who make such complaints to preserve their dignity in the workplace to be fired with impunity. If there are no further questions, I assume my time is up. Thank you. Thank you. You have some time reserved. Ms. Cooperman. Thank you, Your Honor. May it please the court. While Title VII prohibits racial harassment that creates a hostile work environment, it does not make unlawful all utterances of racial epithets as unlawful harassment. Additionally, while Title VII prohibits retaliation against an employee who has complained to her employer about unlawful harassment, not all complaints are protected from retaliation, not all complaints of racial harassment. It is well established that there are parameters to the Title VII protection, and that's what this case is about. This case is about the limits of the scope of the Title VII protection. It is about the requirement that a racially offensive conduct to be unlawful under Title VII has to be... Are there some phrases or names directed at a person which are so offensive in and of themselves that the utterance or use once or twice would create a hostile work environment? No, Your Honor. There are no cases in this court where it has been held that the use of a particular racially offensive term in and of itself on one occasion or two occasions... I didn't limit it to just racial. I just said an utterance could be... Racial or any other unlawful harassment. And, in fact, the case that Mr. Cockey relies upon, which is the Spriggs case, where there's a quotation from the court that deals with the N-word, in that case the court does comment that that is a highly offensive term. However, the court doesn't say that term used one time or a couple of times in and of itself is sufficient to create a hostile work environment. Rather, in the Spriggs case, what we had was daily, constant, racially offensive epithets, conduct, the use of the N-word frequently, the showing of a picture of a monkey and actually putting it inside a manual.  Looking at the facts in light most favorable to Ms. Liberto, that there's no reasonable inference of hostile work environment. Right. Wasn't enough language? Wasn't harsh enough language? It wasn't for a long enough period? Where does the case fail? Well, again, it's not just the single epithet. The court has to look at the totality of the circumstances. Yeah, but I bet if that epithet was used every day for a period of time, I bet that would do it, wouldn't it? That may, sure. And that's a test for a hostile work environment. I ask you, where did this case fall short? It fell short in a number of respects. First, we have to look at the key facts in the case and with due respect. Tell me what they are. Okay. The key facts are this. Tell me why the case falls short under the law. Yes. The facts are, first, that the only racially offensive conduct in the record was the use of the term porch monkey on two occasions. That's it. What about the use of the term chihuahua? That's not in the record. So, in other words, you're just saying on the record, those other terms, there were certain incidents of it, but they just aren't properly in the record. They're not in the record. Why are they not properly in the record? They weren't properly in the record because for a number of reasons. Number one, they were hearsay. They were attempted to be put in the record in interrogatory answers. The interrogatory answers explicitly stated that they weren't solely based on the knowledge of Ms. Liberto, and there's no way to determine where that comment came from. Additionally, so it was hearsay. Additionally, there was no specifics about it. There were no detail as required by the court in numerous cases, Skipper v. Giant Food, for example. There was no indication of how frequently it was said, when it was said, and whose presence. That wouldn't be required to be in the record, would it? That would be required to establish it. No, but that wouldn't be required for it to be in the record. Those interrogatories that somebody just said they aren't specific enough, that wouldn't stop an interrogatory answer from being made part of the record. But to be considered as evidence in support of a summary judgment motion. I asked you why that information wasn't in the record. Why that information? Why is the record so limited? There was other information that was proffered up that wasn't accepted by the court, correct? Correct. Was that just because it wasn't on personal knowledge? It wasn't on personal knowledge. It didn't have the specificity that is required. What kind of specificity do you have to have in an answer to an interrogatory? Is there some requirement that an answer to an interrogatory has to be specific? No, but you need specificity to establish that a hostile work environment exists. I didn't ask you that question, though. That's not what I'm asking you. I'm asking you why aren't those answers to the interrogatory, why aren't they properly admitted into the record in this case? And again, they weren't, or I should say, they weren't considered as valid evidence by the court. Why? They weren't because it was based on hearsay, based on both the disclaimer and the affirmation to the interrogatories, and they weren't something that the court could rely upon. They didn't provide the proper degree of specificity, as I indicated, as this court stated. You don't need any kind of proper degree of specificity that I know of in an answer to an interrogatory. My question is, you seem to be answering it and I don't want to move on. I asked you why they're not in the record. You're answering why they're not in the record and why even if they were in the record they would be no good. I didn't ask you that. You see what I mean? I'm just asking. Your argument has to be that they are not properly part of the motion for summary judgment because they're not a personal knowledge, it's not admissible evidence. That's correct. It seems to me that sort of ends it. It's interrogatories that have never been admitted for that purpose in my knowledge. They're knowledge, information, and belief, and they're supplied from sources that are unspecified. That's correct. It seems to me that's the answer you give to Judge Shedd. I was just asking, was there anything other than that? I wasn't aware of anything else. That's why you say the record is limited. Now you want to talk about what is actually before the court. You say that is what? What was before the court were at most two comments of the use of the term porch monkey. Again, the characterization by Ms. Takaki is frankly not the testimony and not the evidence in this case. First of all, Ms. Liberto within herself has a conflict because when she complained to the clarion, she said to the human resources director, she said that the term porch monkey was used once. This complaint came two days after the alleged incident. So she said it was used once. Also her description, it's in the record on page 316, her description of what happened was they got into this dispute because she had left the restaurant floor. And then as Ms. Clubb was walking away, she mumbled porch monkey. That's what it says. So it's as she turned and she walked away. And in her complaint, in her answers to interrogatories, in her lawsuit here, her complaint here, she said porch monkey was used twice. It was in her deposition all of a sudden porch monkey was used. She said porch monkey was used once. In her deposition, she said porch monkey was used twice. And again, it was just, well, she used the term porch monkey. It wasn't like I'm going to make sure that you're fired. She didn't use any profanity. It was just simply she used the term porch monkey. And as the courts say, you have to look at the totality of the circumstances. What totality of circumstances could use a porch monkey be a good idea? It's not a good idea. And it's very offensive. But it doesn't constitute a hostile work environment. That's because of the context or because it's just using it once or twice is not enough. And the answer to that is yes, both. It's you have to look at the totality of the circumstances. So totality of circumstances doesn't matter if you only used it twice? I'm asking your view of the law. The conduct has to be severe or profane. Using the word porch monkey twice in reference to a worker, you say that in and of itself, that is not enough. According to the cases, according to the Supreme Court cases and this court cases, yes, that's not enough. And another critical fact in the case is that Ms. Club was not Ms. Liberto's supervisor, was not a manager. The Supreme Court this summer decided the Vance case. And the Supreme Court made it clear what a supervisor is. And the supervisor has to be somebody that can actually have a make adverse employment decision that has that kind of control. Ms. Club didn't have that. And in fact, the evidence in the case, and it's in the record that was submitted here, indicates that Ms. Club had no typical, even on a colloquial sense, indicia of supervisor responsibilities. What she was, she had a title. That's about it. She had a title of weekend restaurant manager. She worked three days a week. And when she was there, she would make sure that everything was set up in the restaurant. She would be the hostess. And that's what Ms. Liberto said. I thought she was a glorified hostess. She would help out. It's right there in the record. When they ask her what are her responsibilities, if they needed an additional person to bus tables, I was there. If they needed someone to wait tables, I was there. And my primary responsibility was customer service. What's critical here is in her deposition, when Ms. Liberto was questioned about Ms. Club and what is her authority, and was she your supervisor, Ms. Liberto said, no, she didn't supervise me. She had no authority over me. People told me to ignore her. They said that she couldn't even void tickets. That was it. I didn't even know her title was a restaurant manager. That's what is said in the record. So number one, in fact, she wasn't a supervisor. And number two, Ms. Liberto never considered her a supervisor. So now when we're looking at the conduct, what we're looking at is what the conduct we have is essentially a co-worker making an offensive racial comment on two occasions. And again, I would say that this comment is devoid of all else. It's not as if she went on and on and on and on with a tirade and other offensive terms. It's just not it. And I point to the court just last week decided the case of Bennett versus CSX. And there it was, there was some highly offensive conduct with an African-American employees whose car had racial graffiti put on it. And it had some very offensive racial comments in the graffiti. And additionally, there was a mannequin's head put in the car and painted black with a noose over the head. And when the court found that there was no evidence for the jury to reasonably conclude that the supervisors engaged in that kind of conduct, then it was just could have been co-worker comment and we can't hold this. No, it could have been anybody. They didn't know who did it. Right, right. But there was an indication. It wasn't a supervisor versus co-worker, one or the other. It was no evidence as to who did it. And the fact is that the court found that there was not racial harassment in that case. So here, it's clear from all the cases. Not a single case is cited, and there isn't a single case that says that this kind of conduct by a co-worker, an offensive racial comment on two occasions, and that's it, with nothing else, would constitute, would create an unlawful- What does the evidence in the record, not in the record, I mean the summary judgment evidence, show with respect to the nature of the complaint she made to the Clarendon, to the supervisors? The complaint was she went to the Director of Human Resources. She made a phone call, and she said she had a complaint about Trudy Club. What's the record say about the substance of that complaint? And actually, the substance of the complaint is in the record, but because the HR Director wrote up the substance and had Ms. Liberto sign it. But essentially, Ms. Liberto said that she thought Trudy Club was a racist. The only racial comment that she pointed to that Trudy Club said to her, again, was one time, Porch Monkey, as she was walking away, mumbling. She said that she had other things. She said that, essentially, that Trudy Club was hard on her, that she's hard on other employees. What was the response, the employer's response? The employer's response is that, you know, we won't tolerate any kind of racial conduct, and we'll look into it. That was the response, and that's what they did. But now, turning to the retaliation claim, not only does two offensive comments by a coworker not constitute unlawful harassment, but it's just not objectively reasonable for someone to believe that such comments, in and of themselves, with nothing else, constitutes, would create a hostile work environment. And I point to Your Honor's decision in the Jordan case. And in the Jordan case, the court said that there's a difference between an isolated racial slur, which is always and everywhere inappropriate, and the sort of severe and pervasive conduct. Is it the same standard for summary judgment as it is for retaliation? The same standard, you mean hostile work environment versus? No, I'm talking about there has to be a reasonable belief there. There has to be an objective, reasonable. Isn't that the standard for summary judgment? Yes. Well, I'm asking, is it the same standard? If you lose summary judgment on hostile work environment, the existence of that, do you necessarily lose your retaliation? No. Why is that? Because what the courts have held is that essentially an employee can make a mistake, but it has to be pretty close to establishing a hostile work environment. So while the conduct may not be legally sufficient, it has to be pretty close. And that's what all the cases say. So it has to be, there has to be objective reasonableness. Well, there has to be a reasonable belief. The belief may not be correct, but it has to be a reasonable belief. That would be an objective belief of a reasonable person in the circumstance. That's exactly correct. And that reasonable belief has to be based on the law itself, what the cases essentially have held in terms of what constitutes a hostile work environment. And here, there's just no basis based on all of the cases. And the cases have continually said that a simple, you know, offensive language in and of itself without more in the environment does not create a hostile work environment. An objectively reasonable person understands that there can be an offensive conduct, but it's not going to transform the whole workplace into a hostile work environment. And, you know, this was precisely the issue that the court dealt with in Jordan. You know, to change that, to say that any complaint of a hostile work environment, even if it's just, you know, a couple of offensive comments by a co-worker, is sufficient to be protected activity and therefore protect the person from retaliation under Title VII, flies in the case of the Supreme Court decision. Let me ask you this as a hypothetical. If those answers interrogatory were in the record, would her retaliation claim survive? I don't think so. I still don't think it's enough. It's just not the kind of conduct that the court has found to be sufficiently severe and pervasive. And again, to alter the terms and conditions of an employee's employment, that's what's critical. It's a high standard. And, you know, as the court recently said, the Supreme Court recently said, in Southwestern Texas College of Medicine v. Nassar, which was the case where the court found that the causation to establish a retaliation claim is but for, is the fact that there are, we need to limit, we can't have just any employee at any time, any bit of offensive behavior raising that as a complaint and then is protected, and that just opens the floodgates to retaliation claims. It's a high standard. And so this is precisely why there is the standard that there needs to be a reasonable, objective belief, not just any offensive conduct in the workplace. Thank you. Okay, Mr. Cockey. The written complaint is in the record, and it was a part of the summary judgment record as well. It appears at pages 316 and 317. It can't be part of it. It can be, you can use a complaint against a person when he makes an allocation as admission against interest, but for you to make your summary judgment argument, I'm a little surprised at this, because this is pretty hornbook law. You have to put in evidence that's admissible in evidence. It has to be sworn affidavits on personal knowledge, and none of this was. I don't know why you didn't put in an affidavit in. It seems to me you could have gotten everything in by an affidavit if she had personal knowledge of those things. Well, Rule 56 explicitly allows the use of answers to interrogatories. You can use anything, but it has to be, C-4 says it has to be admissible in evidence and on personal knowledge. Well, the answers to interrogatories reference the Chihuahua's comments. I understand, but that evidence is incompetent. It says on information, knowledge, information, and belief. Right. You could not get on a witness stand and say it's my belief that this or that I have information. You have to testify about what you know, and this goes back to, this is hornbook trial law. Well. I've never seen interrogatories used affirmatively in a summary judgment. Well, both sides use them in this case. Well, she can use them against you because you made admissions, but they come in under a totally different basis. Well, the comments in question, the Chihuahua's remarks, calling her a little girl, not only appear in the written complaint. So it's clear that in firing her, they perceived her to be making that complaint, but they are also referenced in Ms. Club's own affidavit. When she says she heard that Ms. Liberto was complaining that she referred to Hispanic employees as Chihuahuas, and my goodness, she never said that. Your client wasn't a Hispanic, was she? No, but she was an auditor. She was a, she heard that racial, so it provides context. So the argument is that Club calls an Hispanic a Chihuahua. Right. Somehow that creates a hostile racial environment against African Americans? Well, it creates, it makes plausible her perception that Ms. Club's a racist. So when Ms. Club subsequently calls her a porch monkey one day and a damn porch monkey the next day, the inference that this isn't a stray remark, that this is consistent with Ms. Club's character, is a reasonable inference. I thought it had to be because of the employee's race. Pardon me? I thought the violation under Title VII had to be because of the employee's race. It does. And I'm not sure that calling an Hispanic a Chihuahua is a discriminatory comment against a woman who is African American. No. Does that mean the Italian in there is going to be offended, too, by it as a racial comment? No, but if the Italian is later called a Dago and is wondering, well, is this a stray remark, or is this, you know, reflective of some course of conduct, is this objectively reasonable for me to regard as racial harassment if the person who's called a racial epithet as an Italian knows that the manager in question has called other employees racial slurs? It makes it more objectively reasonable. I'm not aware of the fact that the statutory requirement that there be discrimination based on the employee's race, sex, or whatever is a violation. Well, I was under the impression that in order to survive, the retaliation claim had to be objectively reasonable. So if we're wondering, is it objectively reasonable to think Ms. Club is a racist, the fact that she's called Hispanic employees Chihuahuas is now calling... The fact that somebody's a racist doesn't give your client a cause of action. No, but if she acts upon... Your client has to be discriminated against by reason of her race. Correct. All right. Yes, but if she acts upon that racial prejudice, and if the question is, well, is this actual racial prejudice... What if her racial prejudice is only against Italians? Right. Nobody else? Right. Well, I would say... And you say there's a cause of action by an African American? Well, I would say that calling an African American a porch monkey is a pretty vivid... I think it's totally offensive. Right. But that's not the question I'm posing to you. I'm posing to you that I'm not sure you gain much by the fact that this woman may have referred to, at some point in time, and this could be hearsay, that back in July, some employee heard her call out an Hispanic... Well, you know, I actually respectfully agree with you about that, because to me, although I've emphasized that it happened twice, truthfully, I don't want to take refuge behind that. I believe, and I submit, that if she had called her subordinate a porch monkey and threatened to get her fired once, a respectful, appropriate complaint to human resources ought to be protected by law and shouldn't subject her to retaliation of any kind. Gentlemen, I thank you for your time. Thank you. We'll come down and agree counsel and then go into our next case.
judges: William B. Traxler, Jr., Paul V. Niemeyer, Dennis W. Shedd